## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JRJ HOSPITALITY, INC., KMK HOSPITALITY, INC., EIGHT REALTY, LLC, TMK MARKETING, LLC, and GR BRICK, LLC, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | No. 3:20-CV-13095-FLW-DEA |
| | ) | |
| v. | ) | |
| | ) | |
| TWIN CITY FIRE INSURANCE COMPANY d/b/a THE HARTFORD, | ) ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

### AMENDED COMPLAINT

Plaintiffs JRJ Hospitality, Inc. ("JRJ Hospitality") d/b/a Nonna's Citi Cucina, KMK Hospitality, Inc. ("KMK Hospitality") d/b/a Metropolitan Café, Eight Realty, LLC, TMK Marketing, LLC, and GR Brick, LLC ("GR Brick") d/b/a Tre and Rosalita's Roadside Cantina, by and through their attorneys, Fegan Scott LLC, for their Amended Complaint against Defendant Twin City Fire Insurance Company d/b/a The Hartford ("Defendant" or "The Hartford"), allege as follows:

### I.    INTRODUCTION

1.      Insurance contracts are to be interpreted according to their plain meaning. In other words, plain meaning is the principle that insurance contracts must be read in light of the skill and experience of an ordinary person. Moreover, insurance companies must act in good faith when handling a claim and promptly pay benefits owed under a policy.

2.      Here, Defendant has twisted the plain meaning of the insurance policies issued to Plaintiffs, by denying coverage under all-risk commercial property insurance policies for losses suffered as a result of the closure of or restrictions on Plaintiffs' restaurants and businesses due

to COVID-19.

3.      These policies do not contain exclusions for risks of a pandemic, and the necessary public health countermeasures that would mandate business closures and population-wide social distancing.  Thus, Defendant's denials of Plaintiffs' claims are a breach of the contracts and made in bad faith.

4.      On March 11, 2020, the Director of the World Health Organization declared the COVID-19 outbreak a worldwide pandemic: "WHO has been assessing this outbreak around the clock and we are deeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction. We have therefore made the assessment that COVID-19 can be characterized as a pandemic."[1]

5.      On March 16, 2020, the Centers for Disease Control and Prevention, and members of the National Coronavirus Task Force, issued to the American public guidance styled as "30 Days to Slow the Spread" for stopping the spread of COVID-19.  This guidance advised individuals to adopt far-reaching social distancing measures, such as working from home, avoiding shopping trips and gatherings of more than 10 people, and staying away from bars, restaurants, and food courts.[2]

6.      Following this advice, many state government administrations across the nation recognized the need to take steps to protect the health and safety of their residents from the human to human and surface to human spread of COVID-19.  As a result, many governmental entities, including those in the state of New Jersey, entered civil authority orders suspending or

---

[1] See https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.
[2] https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.

severely curtailing business operations of non-essential businesses that interact with the public and provide gathering places for the individuals.

7.      The countermeasures to combat the pandemic, requiring the closure of many businesses, have severely and profoundly impacted restaurants, including those operated by Plaintiffs.  Prior to the pandemic, the National Restaurant Association predicted restaurant industry sales to hit $899 billion in 2020.[3]  After the pandemic, the restaurant industry was predicted to lose $240 billion by year-end, leaving 8 million employees out of work.[4]

8.      Most businesses insure against such catastrophic events like the current unforeseen COVID-19 pandemic through all-risk commercial property insurance policies.  These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, curtailed, and when access to the premises is prohibited because of direct physical loss or damage to the property and/or by a civil authority order that restricts or prohibits access to the property.  This coverage is commonly known as "business interruption coverage" and is standard in most all-risk commercial property insurance policies.

9.      Plaintiffs purchased such insurance coverage from Defendant, expecting their all-risk commercial property insurance policies to insure their restaurants and business against business income losses and extra expenses.  Plaintiffs believed they had purchased comprehensive coverage that would apply to business interruptions under such circumstances, where they have done everything right to protect their businesses, their employees, and the

---

[3] https://restaurant.org/research/reports/state-of-restaurant-industry#:~:text=Top%2Dline%20finds%3A,economy%20and%20positive%20consumer%20sentiment.

[4] https://restaurant.org/articles/news/restaurants-on-track-to-lose-$80-billion-in-sales.

public.  However, when Plaintiffs made claims, seeking insurance coverage under the policies, Defendant denied Plaintiffs' claims.

10.     This action arises from Defendant's denials of Plaintiffs' business interruption insurance coverage claims arising out of the COVID-19 global health pandemic and breach of Defendant's contractual obligations and duty of good faith and fair dealing under the respective all-risk commercial property insurance policy to indemnify Plaintiffs for lost business income and extra expenses incurred to comply with governmental orders to stop the human to human and surface to human spread of the COVID-19 outbreak.

## II.    THE PARTIES

11.     Plaintiff JRJ Hospitality, Inc. is a New Jersey corporation with its principal place of business in Freehold, New Jersey.  JRJ Hospitality operates a restaurant called Nonna's Citi Cucina located at 190 US 9 North, Englishtown, New Jersey.

12.     Plaintiff KMK Hospitality, Inc. is a New Jersey corporation with its principal place of business in Freehold, New Jersey.  KMK Hospitality operates a restaurant called Metropolitan Café at 8 East Main St., Freehold, NJ.

13.     Plaintiff Eight Realty, LLC is a New Jersey limited liability company and its two controlling owners and members are citizens of New Jersey.

14.     Plaintiff TMK Marketing, LLC is a New Jersey limited liability company and its three controlling owners and members are citizens of New Jersey.

15.     Plaintiff GR Brick, LLC is a New Jersey limited liability company and its three controlling owners and members are citizens of New Jersey.  GR Brick operates restaurants called Tre and Rosalita's Roadside Cantina at 1048 Cedar Bridge Ave., Brick, NJ.

16.     Defendant Twin City Fire Insurance Company is an Indiana corporation with its principal place of business in Indianapolis, Indiana.  Defendant is registered to do business in

New Jersey with the New Jersey Division of Insurance.

17.     Twin City Fire Insurance Company is a wholly owned subsidiary of Hartford Fire Insurance Company, which is a subsidiary of Hartford Financial Services Group.

18.     Twin City Fire Insurance Company is one of the companies through which The Hartford conducts business in New Jersey.

## III.     JURISDICTION AND VENUE

19.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different states.  Plaintiff corporations and the members of the LLCs are all citizens of New Jersey and Defendant is a citizen of Indiana.

20.     This Court has personal jurisdiction over Defendant.  Defendant is registered to conduct business with the New Jersey Division of Insurance, regularly conducts business in this state, and has sufficient contacts with this state.  Defendant intentionally availed itself of this jurisdiction by conducting operations in New Jersey and promoting, selling, and marketing Defendant's policies of insurance to New Jersey citizens.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District and because Plaintiffs' insured property which is the subject of this action is located in this District.

## IV.     FACTS

### A.  The COVID-19 Global Health Pandemic

22.     COVID-19 is a respiratory disease that was first identified in Wuhan, China.  It has a wide array of symptoms following infection, ranging from mild symptoms to severe illness resulting in death.  Symptoms include fever or chills, cough, shortness of breath or difficulty breathing, fatigue, and congestion or runny nose, to name a few.  However, certain carriers may

be asymptomatic.[5]

23.     COVID-19 spreads from person to person through respiratory and saliva droplets, as well as person-to-person contact.  Currently there is no vaccine for COVID-19.

### B. The Closure Orders

24.     On March 9, 2020, New Jersey Governor Philip D. Murphy issued Executive Order 103 which declared a "Public Health Emergency and State of Emergency" in the State of New Jersey due to COVID-19.[6]  The Governor declared that the spread of COVID-19 in the state constituted "an imminent public health hazard that threatens and presently endangers the health, safety, and welfare of the residents of one or more municipalities or counties of the State…."[7]  Governor Murphy directed "every person or entity in this State or doing business in this State … to cooperate fully with the State Director of Emergency Management and the Commissioner of DOH in all matters concerning this state of emergency."[8]

25.     On March 13, 2020, the President of the United States declared "that the COVID-19 outbreak in the United States constitutes a national emergency, beginning March 1, 2020."[9]

26.     On March 15, 2020, the Director of the National Institute of Allergy and Infectious Diseases, Dr. Anthony Fauci, called for "a dramatic diminution of the personal interaction that we see in restaurants and in bars," and recommended pursuing "[w]hatever it takes to do that…."[10]

---

[5] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.
[6] https://nj.gov/infobank/eo/056murphy/pdf/EO-103.pdf at 4.
[7] *Id.* at 4.
[8] *Id.* at 6.
[9] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.
[10] https://www.vox.com/policy-and-politics/2020/3/15/21180579/dr-fauci-coronavirus-guidance-meet-press-this-week.

27.     On March 16, 2020, New Jersey Governor Murphy issued Executive Order 104, restricting all restaurants and dining establishments to "offering only food delivery and/or take out services."[11]  The Executive Order also restricted the hours of operation for any restaurant.[12]  The purpose was to impose aggressive social distancing measures to mitigate further spread of COVID-19 in New Jersey.[13]

28.     On March 21, 2020, Governor Murphy issued Executive Order 107, called a "Stay at Home Order," mandating that all residents must remain at home absent essential travel.[14]  The Stay at Home Order continued the prohibition of on-premises consumption of food or beverages, restricting all restaurants, cafeterias, and dining establishments to "offer[ ] only food delivery and/or take out services…."[15]  The Governor again proclaimed that it was "the duty of every person or entity in this State or doing business in this State … to cooperate fully in all matters concerning this Executive Order."[16]

29.     On April 7, 2020, Governor Murphy issued Executive Order 119, extending the declared Public Health Emergency because "the public health hazard presented by the COVID-19 outbreak has only grown in scope in New Jersey, in the region, and across the United States…"[17]  As of that date, "there were over 41,000 positive cases of COVID-19 in New Jersey, with at least 1,003 of those cases having resulted in death…"[18]

30.     On April 11, 2020, Governor Murphy issued Executive Order 125, implementing

---

[11] https://nj.gov/infobank/eo/056murphy/pdf/EO-104.pdf at 7.
[12] *See id*.
[13] *Id.* at 4.
[14] https://nj.gov/infobank/eo/056murphy/pdf/EO-107.pdf.
[15] *Id.* at 7.
[16] *Id.* at 13.
[17] https://nj.gov/infobank/eo/056murphy/pdf/EO-119.pdf at 1-2.
[18] *Id.* at 3.

additional mitigation requirements on transit, private carriers, and restaurants to limit the spread of COVID-19.[19]  The Executive Order limited occupancy in any restaurant continuing to provide food delivery and/or take out services to 10% of capacity, and mandated at least a distance of six feet between workers and customers, except at the moment of payment and/or exchange of goods.[20]  Executive Order 125 also imposed various other safety and sanitation requirements.[21]

31.     On May 6, 2020, Governor Murphy issued Executive Order 138, again extending the declared Public Health Emergency because "the public health hazard presented by the COVID-19 outbreak has only grown in scope in New Jersey, in the region, and across the United States…"[22]  As of that date, "there were over 130,000 positive cases of COVID-19 in New Jersey, with at least 8,244 of those cases having resulted in death; and … there were positive cases of COVID-19 in every county in New Jersey, and there have been deaths relating to COVID-19 in every county in New Jersey…"[23]

32.     On June 2, 2020, Governor Murphy issued Executive Order 150, which as of June 15, 2020, allowed the resumption of outdoor dining, only, but only under the strictest of standards, including social distancing requirements.[24]

33.     On June 4, 2020, Governor Murphy issued Executive Order 151, continuing the declared Public Health Emergency.[25]

34.     On June 26, 2020, Governor Murphy issued Executive Order 157, which as of July 2, 2020, would have allowed the resumption of indoor dining, but with even stricter social

---

[19] https://nj.gov/infobank/eo/056murphy/pdf/EO-125.pdf.
[20] *Id.* at 15-17.
[21] *See id.*
[22] https://nj.gov/infobank/eo/056murphy/pdf/EO-138.pdf.
[23] *Id.* at 3.
[24] *See* https://nj.gov/infobank/eo/056murphy/pdf/EO-150.pdf at 6-7.
[25] https://nj.gov/infobank/eo/056murphy/pdf/EO-151.pdf.

distancing measures and sanitization protocols than placed on outdoor dining, including capacity restrictions and limitations on person-to-person contact.[26]

35.      Then, on June 29, 2020, because of "spikes in COVID-19 cases that have been attributed to indoor food and beverage establishments," Governor Murphy issued Executive Order 158 "to temporarily pause the resumption of indoor dining in New Jersey."[27]

36.      On September 1, 2020, Governor Murphy issued Executive Order 183 which as of September 4, 2020, allowed the resumption of indoor dining "with strict capacity limits and health and safety protocols."[28]  The Executive Order, among other things, limited " the number of patrons in indoor areas to 25 percent of the food or beverage establishment's indoor capacity, excluding the food or beverage establishment's employees" and mandated that tables be "six feet apart in all directions from any other table or seat."[29]

### C.  Plaintiffs Comply with the Governmental Mandates

37.      Plaintiffs operate four restaurants in New Jersey:  Nonna's City Cucina, located at 190 US 9 North, Englishtown, Monmouth County, New Jersey; Metropolitan Café, located at 8 East Main St., Freehold, Monmouth County, New Jersey; and Tre and Rosalita's Roadside Cantina, both located at 1048 Cedar Bridge Ave., Brick Township, Ocean County, New Jersey.

38.      On March 16, 2020, to comply with Governor Murphy's Executive Order and all applicable state and local guidance, Plaintiffs' four restaurants ceased operating for two weeks. During that time, Plaintiffs began preparing to reopen for take-out and delivery service in accordance with state and local standards.  Prior to that time, Plaintiffs' take-out business at each

---

[26] *See* https://nj.gov/infobank/eo/056murphy/pdf/EO-157.pdf at 3.
[27] https://nj.gov/infobank/eo/056murphy/pdf/EO-158.pdf.
[28] https://nj.gov/infobank/eo/056murphy/pdf/EO-183.pdf.
[29] *Id.* at 4.

of Plaintiffs' four locations was less than 5% of each location's gross sales. On or around March 30, 2020, Plaintiffs four restaurants began providing take-out and delivery service.

39. Then on June 15, 2020, Plaintiffs began providing limited outdoor dining under the government mandated standards.

40. On September 4, 2020, Plaintiffs began offering limited indoor dining, again under the restrictive government standards.

41. Plaintiffs experienced a dramatic drop in business income in March of 2020, continuing through the present. Plaintiffs also incurred expenses in connection with modifications to and operations of their businesses in accordance with allowable standards and ensuring compliance with all local and state guidelines.

42. As a result, Plaintiffs have suffered a direct physical loss of, and damage to, their premises because they have been unable to use, or fully use, the properties for their intended purpose and/or otherwise maintain their business operations.

43. Even in the current atmosphere of indoor dining at a dramatically reduced capacity, and because of the oncoming fall and winter weather, Plaintiffs' businesses will experience residual effects of the pandemic because the public views indoor, occupied spaces as potentially unsafe.

44. Plaintiffs purchased comprehensive business insurance from Defendant to ensure against all risks that a business might face, such as the events that occurred as a result of the pandemic.

45. Generally, each insurance policy covers direct physical loss of or damage to covered properties caused by or resulting from any covered cause of loss. The policies specifically provide:

a.  coverage for physical loss of property that was caused by or resulted from any covered cause of loss;

b.  coverage for 12 months of business income that is lost due to the necessary suspension of operations caused by a physical loss of property;

c.  coverage for 90 days of extended business income, which pays for lost profits and expenses that continue while a business rebounds from a covered loss that causes an interruption in the business;

d.  coverage for business income that is lost due to physical loss at the premises of a dependent property;

e.  coverage for 30 days of business income that is lost when access to the scheduled premises is prohibited by order of a civil authority as a result of a covered cause of loss; and

f.  coverage for physical loss of property that was caused by a virus.

46.    The policies explicitly exclude a variety of risks:  earth movement, seizure of property by order of governmental authority, nuclear hazard, power failure, war and military action, water damage caused by flood, and neglect of an insured to use all reasonable means to save and preserve property from further damage.

47.    However, the policies do not exclude the risks of a pandemic, and the necessary public health counter-measures that would mandate business closures and population-wide social distancing.

48.    Plaintiffs have paid Defendant all premiums required by Defendant to keep the policies in full force.

### D.  The Hartford Policies

#### 1.  JRJ Hospitality

49.     In return for payment of the premium, Defendant issued Policy No. 13 SBA AA475 to JRJ Hospitality, for the periods March 23, 2019 to March 23, 2020 (the "JRJ Hospitality Policy").

50.     Pursuant to an endorsement (No. 1) effective March 23, 2019, JRJ Hospitality, Inc. d/b/a Nonna's City Cucina; KMK Hospitality, Inc d/b/a Metropolitan Café d/b/a Great Restaurants; DRJ Hospitality, LLC; and Eight Realty LLC were added as additional insureds to the JRJ Hospitality Policy.  Pursuant to an endorsement (No. 4) effective August 14, 2019, TMK Marketing, LLC d/b/a Great Restaurants was added as an additional insured to the JRJ Hospitality Policy (collectively, the "JRJ Entities").

51.     The Covered Property and Scheduled Premises under the JRJ Policy includes the restaurants Nonna's Citi Cucina at 190 US 9 North, Englishtown, NJ and Metropolitan Café at 8 East Main St., Freehold, NJ.  The JRJ Policy and all endorsements for the period March 23, 2019 to March 23, 2020 are attached as Exhibit A.

52.     In return for full payment of the premium, Defendant renewed Policy 13 SBA AA4745 to the JRJ Entities for the period March 23, 2020 to March 23, 2021.  The JRJ Policy and all endorsements for the period March 23, 2020 to March 23, 2021 are attached as Exhibit B.

53.     The JRJ Policy is currently in full effect, providing property, business personal property, business income and extra expense, extended business income, business income from dependent properties, civil authority, and virus coverage for a policy period of March 23, 2019 to March 23, 2020 and March 23, 2020 to March 23, 2021.

#### 2.  GR Brick

54.     In return for full payment of the premium, Defendant issued Policy No. 13 SBA

12

NZ9707 to GR Brick, LLC d/b/a Rosalita's and Tre for the periods December 8, 2019 to December 8, 2020 (the "GR Brick Policy").

55.     The Covered Property and Scheduled Premises under the GR Brick Policy includes the restaurants Tre and Rosalita's Roadside Cantina both located at 1048 Cedar Bridge Ave., Brick, NJ.  The GR Brick Policy and all declarations are attached as Exhibit C.

56.     The GR Brick Policy is currently in full effect, providing property, business personal property, business income and extra expense, extended business income, business income from dependent properties, civil authority, and virus coverage for a policy period of December 8, 2019 to December 8, 2020.

57.     Plaintiffs have performed all of their obligations under the policies, including the payment of the premiums.

### 3.   The Applicable Policy Language

58.     The relevant language in the policies at issue is the same.  Plaintiffs' insurance policies included standard forms that are used by The Hartford for all insureds with similar coverage.  Plaintiffs did not participate in the drafting or negotiating of the terms of its insurance policies.  Instead, the terms of the policies were unilaterally set by the Hartford and presented on a take-it-or-leave-it basis.  Plaintiffs did not possess any leverage or bargaining power to alter or change the terms and conditions of the insurance policies at issue.

59.     Each of the policies contains a Special Property Coverage Form, Form SS 00 07 07 05.  In return for Plaintiffs' premium payments, Defendant provided business income, extra expense, extended business income, business income from dependent properties, civil authority, and virus coverage that indemnifies Plaintiff for lost business income and expenses.

60.     Plaintiffs' Business Income coverage provision states:

        We will pay for the actual loss of Business Income you sustain due

13

> to the necessary suspension of your 'operations' during the 'period
> of restoration'. The suspension must be caused by direct physical
> loss of or direct physical damage to property at the 'scheduled
> premises' … caused by or resulting from a Covered Cause of Loss.

Special Property Coverage Form, ¶A.5.o(1).

61.     The Hartford is required to pay for "loss of Business Income that occurs within 12

consecutive months after the date of direct physical loss or physical damage.  This Additional

Coverage is not subject to the Limits of Insurance." *Id.* at ¶A.5.o(3).

62.     "Business Income" means the:

> (a) Net Income (Net Profit or Loss before income taxes) that would
> have been earned or incurred if no direct physical loss or physical
> damage had occurred; and (b) Continuing normal operating
> expenses incurred, including payroll.

*Id.* at ¶A.5.o(4).

63.     "Suspension" means: "The partial slowdown or complete cessation of your

business activities…."  *Id.* at ¶A.5.o(5).

64.     Plaintiffs' Extended Business Income provision states:

> (1) If the necessary suspension of your 'operations' produces a
> Business Income loss payable under this policy, we will pay for the
> actual loss of Business Income you incur during the period that: (a)
> Begins on the date property is actually repaired, rebuilt or replaced
> and 'operations' are resumed; and (b) Ends on the earlier of: (i)
> The date you could restore your 'operations' with reasonable
> speed, to the condition that would have existed if no direct physical
> loss or damage occurred; or (ii) 30 consecutive days after the date
> determined in (1)(a) above.
>
> Loss of Business Income must be caused by direct physical loss or
> physical damage at the 'scheduled premises' caused by or resulting
> from a Covered Cause of Loss.

*Id.,* ¶A.5.r(1).

65.     Plaintiffs' Extra Expense coverage provision states:

> We will pay reasonable and necessary Extra Expense you incur

during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or physical damage to property at the 'scheduled premises' … caused by or resulting from a Covered Cause of Loss.

*Id.*, ¶A.5.p(1).

66.     "Extra Expense" means expense incurred:

(a) To avoid or minimize the suspension of business and to continue 'operations': (i) At the 'scheduled premises'; … (b) To minimize the suspension of business if you cannot continue 'operations.' (c) (i) To repair or replace any property….

We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or physical damage. This Additional Coverage is not subject to the Limits of Insurance.

*Id.*, ¶A.5.p(3).

67.     Plaintiffs' Business Income from Dependent Properties provision states:

(1) We will pay for the actual loss of Business Income you sustain due to direct physical loss or physical damage at the premises of a dependent property caused by or resulting from a Covered Cause of Loss…

*Id.,* ¶A.5.r(1).

68.     Plaintiffs' Civil Authority coverage provision states:

(1) This insurance is extended to apply to the actual loss of Business Income you sustain when access to your 'scheduled premises' is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of your 'scheduled premises'.

(2) The coverage for Business Income will begin 72 hours after the order of a civil authority and coverage will end at the earlier of: (a) When access is permitted to your 'scheduled premises'; or (b) 30 consecutive days after the order of the civil authority.

*Id.,* ¶A.5.q(1)-(2).

69.     Plaintiffs' Fungi, Bacteria or Virus coverage provision, Form SS 40 93 07 05,

provides $50,000 of insurance coverage per location caused by direct physical loss due to a

virus:

> a. The coverage described in 1.b. below only applies when the "fungi", wet or dry rot, bacteria or virus is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence. (1) A 'specified cause of loss' other than fire or lightening….
>
> b. We will pay for loss or damage by 'fungi', wet rot, dry rot, bacteria and virus. As used in this Limited Coverage, the term loss or damage means: (1) Direct physical loss or direct physical damage to Covered Property caused by "fungi", wet rot, dry rot, bacteria or virus, including the cost of removal of the "fungi", wet rot, dry rot, bacteria or virus;
>
> c. … the coverage described under this Limited Coverage is no more than the Limit of Insurance stated in the Declarations for Building and Business Personal Property, but not greater than $50,000.

Limited Fungi, Bacteria or Virus Coverage, ¶B.1.a(1).

70.     The policies define covered causes of loss as "risks of direct physical loss" unless the loss is otherwise excluded or limited by the policy.  Special Property Coverage Form, ¶A.3.

71.     Any exclusions in the policies that contradict the business income, extra expense, extended business income, business income from dependent properties, civil authority, and virus provisions are not enforceable as they violate New Jersey public policy as contracts of adhesion.

72.     Had Defendant wanted to exclude the risks of a pandemic, and the necessary public health counter-measures that would mandate business closures and population-wide social distancing, it should have done so plainly, as it did with numerous other risks.  But it did not, and the policies at issue contain no such exclusions.

73.     The policies at issue do not properly exclude the losses suffered by Plaintiffs and thereby The Hartford is obligated to cover Plaintiffs' business income losses and extra expenses incurred due to the necessary suspension of its business operations.

16

### E.  The Hartford Denies Plaintiffs' Claims

74.     The JRJ Entities made a claim under the JRJ Policy for business interruption and other losses.  Notwithstanding that Plaintiffs' claims were covered losses, Defendant denied Plaintiffs' claim without any investigation or inquiry.  A true and correct copy of the denial letter is attached as Exhibit D.  As to the JRJ Policy, on July 1, 2020, Defendant denied Plaintiffs' claim as follows:

> We have completed a review of your loss and have determined that since the coronavirus did not cause property damage at your place of business or in the immediate area, this business income loss is not covered.  Even if the virus did cause damage, it is excluded from the policy and the limited coverage available for losses caused by virus does not apply to the facts of your loss.

> As we understand the facts, you are suffering from a loss of business income because you, or a business you depend on, have had to close or limit your business to help prevent the spread of COVID-19, the disease caused by the novel coronavirus.

> *          *          *

> The Business Income coverage is not provided for your claim because there has been no physical loss or damage caused by or resulting from a Covered Cause of Loss to property at a scheduled premises.

> *          *          *

> We have no information to indicate that a civil authority issued an order as a direct result of a covered cause of loss to property in the immediate area of your scheduled premises; accordingly this additional coverage is not available for your claimed loss of business income.

> *          *          *

> To the extent you are making a claim for loss of business income from a dependent property, no direct physical loss or damage caused by or resulting from a Covered Cause of Loss has occurred at a Dependent Property.  Accordingly, there is no coverage for your claim under this coverage part.

75.     The denial letter indicated the existence of exclusions, including a Pollution

Exclusion, defining "Pollutants and Contaminants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapors, soot, fumes, acids, alkalis, chemicals and waste," may also preclude coverage.

76. Defendant also claimed that coverage under the Fungi, Bacteria or Virus provision was not applicable because "As we understand your loss, the virus did not result from a specified cause of loss; therefore, there is no coverage for your claim based on the limited coverage for virus." *Id.*

77. Then by letter dated September 8, 2020, The Hartford sent the JRJ Entities a letter relating to the JRJ Hospitality Policy, stating that a claim representative is "available to assist with all your claim related questions," and despite the earlier denial of coverage under the policy, stated that The Hartford was "in receipt of your claim," but not providing a claim number. A true and correct copy of the letter is attached as Exhibit E.

78. The GR Brick Entities similarly made a claim under the GR Brick Policy for business interruption and other losses. Notwithstanding that Plaintiffs' claims were covered losses, Defendant denied Plaintiffs' claim without any investigation or inquiry. Defendant denied coverage under the GR Brick Policy on April 8, 2020 under a virtually identical form document. A true and correct copy of the letter is attached as Exhibit F.

79. Indeed, Defendant's form denial letter appears to have been sent to other Hartford policyholders to deny business income and loss expenses claims in New Jersey and in other states and the District of Columbia.

## CAUSES OF ACTION

### COUNT I
### DECLARATORY JUDGMENT

80. Plaintiffs repeat all allegations set forth above as if set forth in full herein.

81.     Plaintiff purchased comprehensive business insurance policies from Defendant.

82.     Plaintiff paid all premiums required to maintain its comprehensive business insurance policies in full force.

83.     The comprehensive business insurance policies include terms that provide coverage for the direct physical loss of use of Plaintiffs' premises and equipment, as well as actual loss of business income and extra expenses sustained during the suspension of operations.

84.     Beginning on March 16, 2020 and continuing thereafter, the State of New Jersey issued a series of Executive Orders that severely restricted access to Plaintiffs' restaurants, and Plaintiffs' ability to continue business operations as before.  As a result of the Executive Orders, Plaintiffs lost the use of its business, its business properties, and lost substantial business income as a result.  These losses continue to this day and are expected to continue into the future.

85.     These losses are insured losses under several provisions of Plaintiffs' comprehensive business insurance policies including provisions covering direct loss of property, loss of business income, extended loss of business income, business income from dependent properties, extra expense, civil authority, and fungi, bacteria, and virus coverage.

86.     There are no applicable enforceable exclusions or definitions in the insurance policies that preclude coverage for these losses.

87.     An actual and justiciable controversy exists between Plaintiffs and Defendant as to Defendant's obligations under the insurance policies at issue to cover Plaintiffs' claims for business income losses and extra expense that Plaintiffs incurred in direct connection and as a result of the necessary suspension of its business stemming from the Governor's Executive Orders in response to COVID-19.

88.     Pursuant to New Jersey's Uniform Declaratory Judgments Act, N.J. Stat. §§

2A:16-50-2A16:62, Plaintiffs therefore request a declaration of the following:

    a. That Defendant's comprehensive business insurance policies cover claims for lost business income under the circumstances present here;

    b. That the terms, definitions, and exclusions that Defendant relied on to deny coverage are contradictory or ambiguous and therefore should not be construed against Plaintiffs;

    c. That Defendant breached the implied covenant of good faith and fair dealing in obscuring policy exclusions or unilaterally amending their policies to exclude coverage for business income under the circumstances presented here; and

    d. That Defendant acted in bad faith in denying claims for lost business income and extra expenses without investigation or due consideration of those claims.

**COUNT II**
**BREACH OF CONTRACT**

89.    Plaintiffs repeat all allegations set forth above as if set forth in full herein.

90.    Plaintiffs purchased comprehensive business insurance policies from Defendant.

91.    Plaintiffs met all of their contractual obligations under the policies, including payment of all premiums required by Defendant.

92.    Beginning on March 16, 2020 and continuing thereafter, the State of New Jersey issued a series of Executive Orders that severely restricted access to Plaintiffs' restaurants, and Plaintiffs' ability to continue business operations as before.  As a result of the Executive Orders, Plaintiffs lost the use of its business, its business properties, and lost substantial business income as a result.  These losses continue to this day and are expected to continue into the future.

93.     These losses are insured losses under several provisions of Plaintiffs' comprehensive business insurance policies including provisions covering direct loss of property, loss of business income, extended loss of business income, business income from dependent properties, extra expense, civil authority, and fungi, bacteria, and virus coverage.

94.     There are no applicable enforceable exclusions or definitions in the insurance policies that preclude coverage for these losses.

95.     Defendant breached these contracts by denying comprehensive business insurance coverage to Plaintiffs.

96.     As a direct and proximate result of Defendant's denial of comprehensive business insurance coverage to Plaintiffs, Plaintiffs have suffered damages.

**COUNT III**
**BAD FAITH**

97.     Plaintiffs repeat all allegations set forth above as if set forth in full herein.

98.     Plaintiffs purchased comprehensive business insurance policies from Defendant.

99.     Plaintiffs met all of their contractual obligations under the policies, including payment of all premiums required by Defendant.

100.    These contracts of insurance were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their duties, both explicit and implied, and not impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts.  Defendant also owed Plaintiffs a duty of good faith in processing their claims.

101.    Beginning on March 16, 2020 and continuing thereafter, the State of New Jersey issued a series of Executive Orders that severely restricted access to Plaintiffs' restaurants, and Plaintiffs' ability to continue business operations as before.  As a result of the Executive Orders,

Plaintiffs lost the use of its business, its business properties, and lost substantial business income as a result.  These losses continue to this day and are expected to continue into the future.

102.    These losses are insured losses under several provisions of Plaintiffs' comprehensive business insurance policies including provisions covering direct loss of property, loss of business income, extended loss of business income, business income from dependent properties, extra expense, civil authority, and fungi, bacteria, and virus coverage.

103.    There are no applicable enforceable exclusions or definitions in the insurance policies that preclude coverage for these losses.

104.    Defendant acted with malice and in bad faith by denying comprehensive business insurance coverage to Plaintiffs in light of the policies and the facts, without any investigation or inquiry.

105.    As a direct and proximate result of Defendant's denial of comprehensive business insurance coverage to Plaintiffs, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs respectfully request that this Court:

a.    Declare that Defendant is required to compensate Plaintiffs' losses under the insurance policies at issue;

b.    Award Plaintiffs damages for breach of contract and bad faith, and punitive damages for bad faith;

c.    Award Plaintiffs attorneys' fees pursuant to N.J. R. 4:42-9(a) or otherwise; and

d.    Award Plaintiffs such other and further relief as is just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims so triable.

Dated: October 20, 2020

By:    /s/ Jonathan Lindenfeld

22

Jonathan Lindenfeld
FEGAN SCOTT LLC
140 Broadway, 46th Floor
New York, NY 10005
Phone: 332.216.2101
Fax: 312.264.0100
jonathan@feganscott.com

Lynn A. Ellenberger
FEGAN SCOTT LLC
500 Grant St., Suite 2900
Pittsburgh, PA 15219
Phone: 412.346.4104
Fax: 412.785.2400
lynn@feganscott.com
*Pro Hac Vice Forthcoming*

Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Phone: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com
*Pro Hac Vice Forthcoming*

Counsel for Plaintiffs